UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Paul Douglas Martin

    v.

Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration

Civil No. 18-cv-461-JL
Opinion No. 2019 DNH 073

**O R D E R**

Paul Martin moves to reverse the decision of the Acting Commissioner of the Social Security Administration ("SSA") to deny his application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423. The Acting Commissioner, in turn, moves for an order affirming her decision. For the reasons that follow, this matter is remanded to the Acting Commissioner for further proceedings.

**I. Scope of Review**

The scope of judicial review of the Acting Commissioner's decision is as follows:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

1

42 U.S.C. § 405(g). However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

## II. Background

Martin was born in 1969. He has worked in construction, as a farm hand, as a stocker in a grocery store, and as an escort driver. He stopped working in August of 2014, and the date on which he was last insured for DIB, his "DLI," was December 31, 2015. Before his DLI, Martin was diagnosed with, and/or treated for obstructive sleep apnea, asthma, poorly controlled diabetes mellitus, insomnia, depression with anxiety, malaise, a transient ischemic attack,[1] nephrolithiasis,[2] benign essential hypertension, acute bronchitis, atrial fibrillation, morbid

---

[1] Ischemic means "[r]elating to or affected by ischemia." Stedman's Medical Dictionary 1001 (28th ed. 2006). Ischemia is a "[l]ocal loss of blood supply due to mechanical obstruction (mainly arterial narrowing or disruption) of the blood vessel." Id.

[2] Nephrolithiasis is the "[p]resence of renal calculi." Stedman's, supra note 1, at 1290. Calculi are "concretions formed in any part of the body, most commonly in the passages of the biliary and urinary tracts . . . SYN stone." Id. at 289.

2

obesity, a ganglion cyst, and neuropathy.[3]  Since his DLI, Martin has been diagnosed with "[p]robable right heart dysfunction (right heart failure)," Administrative Transcript (hereinafter "Tr.") 1305, and left-shoulder calcific tendinopathy.[4]

Martin applied for DIB in February of 2015, claiming that he had been disabled since September 1, 2014, as a result of diabetic neuropathy, heart palpitation and hypertension, atrial fibrillation, insomnia, asthma, diverticulitis, depression and anxiety, and obstructive sleep apnea.

In April of 2015, Dr. Marcia Lipski, a physician and state-agency consultant, reviewed Martin's medical records and assessed his physical residual functional capacity ("RFC").[5] Martin underwent a consultative psychological examination in May of 2015, and a month later, Dr. Jan Jacobson, a state-agency psychological consultant, reviewed Martin's medical records and assessed his mental RFC.  In November of 2015, Martin's primary

---

[3] Neuropathy is "a disease involving the cranial nerves or the peripheral or autonomic nervous system." Stedman's, supra note 1, at 1313.

[4] Tendinopathy is "any pathologic condition of a tendon." Dorland's Illustrated Medical Dictionary 1881 (32nd ed. 2012).

[5] "[R]esidual functional capacity 'is the most [a claimant] can still do despite [his] limitations.'" Purdy v. Berryhill, 887 F.3d 7, 10 n.2 (1st Cir. 2018) quoting 20 C.F.R. § 416.945(a)(1), a regulation governing claims for supplemental security income that is worded identically to 20 C.F.R. § 404.1545(a)(1), which governs claims for DIB) (brackets in the original).

3

care provider referred him to Drs. Karen Huyck and Raymond Klein "as part of a Social Security disability evaluation," Tr. 732. Drs. Huyck and Klein, in turn, "referred [Martin] for [a] residual functional capacity exam with [their practice's] occupational therapist to further objectively document his functional impairment." Tr. 736. The occupational therapist, Gregory Morneau, performed the RFC exam that Dr. Huyck and Klein had requested, and he produced a report on it. Thereafter, Dr. Huyck reviewed Mr. Morneau's report with Martin, reproduced it in a progress note, and provided a brief commentary on it.

The SSA denied Martin's application for DIB. He then requested, and received, a hearing before an Administrative Law Judge ("ALJ"). At the hearing, the ALJ took testimony from Dr. Joseph Gaeta, a cardiologist who reviewed Martin's medical records. Dr. Gaeta testified that none of Martin's physical impairments, either alone or in combination, met or medically equaled the severity of a "listed impairment," i.e., a medical condition on the SSA's list of impairments that are per se disabling. As to Martin's physical RFC, Dr. Gaeta testified that Martin had no exertional, manipulative, visual, communicative, or environmental limitations. But, with respect to postural activities, Dr. Gaeta opined that Martin: (1) was limited to occasional stooping, bending, crawling, and kneeling;

and (2) needed to avoid hazardous machinery, heights, and the climbing of ladders and scaffolds.

The ALJ also took testimony from a vocational expert ("VE"). He began by asking the VE to consider the following hypothetical individual:

> [A] 47 year old with an eighth grade education and the Claimant's work history [with] no limitations with regard to lifting, sitting, standing, or walking [who] should avoid hazards, unprotected heights, and climbing ladders, scaffoldings, and ropes. The remaining postural are at occasional.

Tr. 65. The VE testified that the individual described in the ALJ's hypothetical question, which was based on Dr. Gaeta's RFC assessment, could perform Martin's previous heavy-duty, semi-skilled stock-clerk job, and could also perform three light-duty unskilled jobs: Marker II, Fruit Distributer, and Mail Clerk.

The ALJ asked a second hypothetical question, positing an individual with claimant's same age, education, and work history, and who:

> Can lift 20 pounds occasionally, 10 pounds frequently. Can stand or walk for two hours, sit for six. Can occasionally operate foot controls with his lower extremities. Should never climb ladders, scaffoldings, or ropes, and the remaining posturals are at occasional.

Tr. 66-67. The VE testified that the individual described in the ALJ's second question, which was based on Dr. Lipski's RFC assessment: (1) could not do any of claimant's past work; (2) could not do the jobs of Marker II, Fruit Distributor, or Mail

5

Clerk; but (2) could perform the sedentary unskilled jobs of Table Worker, Food and Beverage Order Clerk, and Surveillance System Monitor. In response to the ALJ's final hypothetical question, the VE testified that none of the three jobs he identified would be precluded if the hypothetical individual were further "limited to one to three step instructions and [was] able to sustain concentration, persistence, and pace during the typical two-hour periods of an eight-hour workday and 40-hour workweek," Tr. 68, a limitation that was based on Dr. Jacobson's assessment of Martin's mental RFC.

In response to questioning by claimant's counsel, the VE testified that the Table Worker, Food and Beverage Order Clerk, and Surveillance System Monitor jobs: (1) would not be precluded if the hypothetical individual were limited to 30 minutes of standing at a time and 37 minutes of sitting at a time, limitations that appear to be based on Mr. Morneau's RFC assessment; (2) would not be precluded if the individual "would not be able to use his lower extremities for any kind of pushing or pulling, or foot controls," Tr. 70, a limitation that is more restrictive than the limitation on those exertional activities that Dr. Lipski described in her RFC assessment; but (3) would be precluded if the individual "had no ability to reach, handle, or finger," id., a limitation that appears to have no support in the medical-opinion evidence. The VE also testified that an

6

inability to squat or stoop, another limitation that appears to lack support in the medical-opinion evidence, would preclude a person from doing the jobs of Food and Beverage Order Clerk and Table Worker, but would not preclude performance of the Surveillance System Monitor job.

After Martin's hearing, the ALJ issued a decision in which he determined that Martin had two severe impairments, cardiac arrythmia and obesity, neither of which, either alone or in combination, met or medically equaled the severity of any listed impairment. Then, the ALJ found that Martin

> had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he needs to avoid hazards, unprotected heights and climbing ladders/scaffoldings/ropes [and] is limited to occasional climbing stairs/ramps and occasional bending, stooping, crouching, kneeling, and crawling.

Tr. 27. In other words, the ALJ adopted Dr. Gaeta's opinions on claimant's physical RFC.

When assessing Martin's RFC, the ALJ recounted various statements claimant had made "concerning the intensity, persistence and limiting effects of [the] symptoms [of his impairments]," Tr. 27, but found that those statements were "not entirely consistent with the medical evidence and other evidence in the record," id. In addition, the ALJ gave little weight to Dr. Lipski's opinions, little weight to Mr. Morneau's RFC assessment, and great weight to Dr. Gaeta's opinions.

7

Based on his assessment of Martin's RFC, and the testimony of the VE, the ALJ determined that Martin could perform his past work as a grocery-store stocker. Consequently, the ALJ concluded that Martin was not under a disability from September 1, 2014, through December 31, 2015, which was the date on which he was last insured for DIB.

### III. Discussion

A. The Legal Framework

To be eligible for DIB, a person must: (1) be insured for that benefit; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability. 42 U.S.C. § 423(a)(1)(A)-(D). The only question in this case is whether the ALJ correctly determined that Martin was not under a disability from September 1, 2014, through December 31, 2015.

To decide whether a claimant is disabled for the purpose of determining eligibility for DIB, an ALJ is required to employ a five-step sequential evaluation process. See 20 C.F.R. § 404.1520.

> The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5)

> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Purdy v. Berryhill, 887 F.3d 7, 10 (1st Cir. 2018) (quoting Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); citing 20 C.F.R. § 416.920, which outlines the same five-step process as the one prescribed in 20 C.F.R. § 404.1520).

At the first four steps in the sequential evaluation process, the claimant bears both the burden of production and the burden of proof. See Purdy, 887 F.3d at 9 (citing Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); see also Bowen v. Yuckert, 482 U.S. 137, 146 (1987). He must prove he is disabled by a preponderance of the evidence. See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).[6] Finally,

> [i]n assessing a disability claim, the [Acting
> Commissioner] considers objective and subjective
> factors, including: (1) objective medical facts; (2)
> [claimant]'s subjective claims of pain and disability
> as supported by the testimony of the [claimant] or
> other witness; and (3) the [claimant]'s educational
> background, age, and work experience.

---

[6] At step five, the burden of proof shifts to the Acting Commissioner, see Seavey, 276 F.3d at 5 (citing Arocho v. Sec'y of HHS, 670 F.2d 374, 375 (1st Cir. 1982)), but the Acting Commissioner's step-five determination is not at issue here, so there is no need to describe the mechanics of step five.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

B. Martin's Claims

Martin claims that the ALJ erred in assessing his RFC by: (1) "[i]gnoring vital evidence of [his] limitations caused by medically determinable impairments," Cl.'s Mem. of Law (doc. no. 17-1) 13; (2) improperly evaluating the medical-opinion evidence; and (3) improperly assessing his statements about his symptoms. Martin's third claim warrants a remand.

1. Assessment of Symptoms

Martin claims that "[t]he ALJ's assessment of [his] credibility was flawed," Cl.'s Mem. of Law (doc. no. 17-1) 14, and he advances multiple grounds for that claim, some meritorious, others less so. The specific claim that entitles Martin to a remand is his assertion that when assessing the limiting effects of his symptoms, the ALJ engaged in an incomplete analysis. That said, the court begins by describing the applicable legal principles and then turns to the ALJ's application of those principles.

But first, it is important to understand that the ALJ did not assess Martin's credibility. In his decision, the ALJ cited both Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996), which uses the concept of credibility,

and SSR 16-3p, 2016 WL 1119029 (S.S.A. Mar. 16, 2016), which rescinded SSR 96-7p and disavowed the concept of credibility. But even though he cited SSR 96-7p, the ALJ never used the term "credibility" in his decision. Thus, claimant's use of that term in his memorandum of law is a somewhat misleading.[7]

### a. Legal Principles

When assessing a claimant's symptoms, an ALJ must employ a two-step process. The first step in the analysis is to determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce his alleged symptoms. See SSR 16-3p, 2016 WL 1119029, at *3. If so, the second step is to evaluate the intensity and persistence of the claimant's symptoms and determine the extent to which they limit his ability to perform work-related activities.

When undertaking the second step, an ALJ must first determine whether the claimant's alleged symptoms are consistent with the objective medical evidence. If not, then the ALJ must consider the other evidence in the record, including "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms,

---

[7] Moreover, because "SSR 16-3p is materially the same as its predecessor," Tellier v. U.S. Soc. Sec. Admin., Acting Comm'r, No. 17-cv-184-PB, 2018 WL 3370630, at *6 n.6 (D.N.H. July 10, 2018), the mere fact that the ALJ in this case cited SSR 96-7p is hardly a reversible error," see Venus v. Berryhill, No. 17-cv-482-PB, 2019 WL 157296, at *14 (D.N.H. Jan. 9, 2019).

including agency personnel, as well as the factors set forth in [the SSA's] regulations." SSR 16-3p, 2016 WL 1119029, at *5. The factors to which SSR 16-3p refers are set forth in 20 C.F.R. § 404.1529(c)(3), and are sometimes called the Avery factors, see 797 F.2d at 29. The Avery factors include:

> 1. Daily activities;
>
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 WL 1119029, at *7.

### b. Application

In his decision, the ALJ correctly described the applicable analytical framework and, in particular, he noted that

> whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [an ALJ] must consider other evidence in the

> record to determine if the claimant's symptoms limit
> the ability to do work-related activities.

Tr. 27 (emphasis added). The problem in this case is that after the ALJ determined that claimant's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," Tr. 27, he only performed half of the second step of the requisite analysis. Specifically, he stated that "because the claimant has failed to establish a correlation between [his] allegations and the objective medical evidence, the undersigned finds the claimant's symptom[s] are not supported to the extent alleged." Tr. 28. In other words, after performing the first half of the second step of the analysis, i.e., considering the objective medical evidence, the ALJ went no further, and failed to consider any other evidence in the record, even though he had acknowledged his obligation to do so in his description of the applicable analytical framework. To be fair, when describing Dr. Gaeta's testimony regarding his step-3 finding and/or his RFC assessment, the ALJ did note Dr. Gaeta's observations that Martin had done well after each of his two cardiac ablation procedures, see Tr. 29, and a claimant's treatment is one of the Avery factors, see SSR 16-3p, 2016 WL 1119029, at *7. But the ALJ's passing references to claimant's cardiac ablations do not qualify as "a proper discussion and analysis [that] identif[ies] what testimony [by the claimant] is not [supported] and what

evidence undermines the claimant's complaints," Gottier v. Colvin, No. 15-cv-355-SM, 2016 WL 4734402, at *6 (D.N.H. Sept. 12, 2016) (quoting Anderson v. Colvin, No. 14-cv-15-LM, 2014 WL 5605124, at *7 (D.N.H. Nov. 4, 2014)), and the plain language of the ALJ's decision makes it clear that he rested his decision to discount claimant's symptoms solely on the lack of support from the objective medical evidence.

While the ALJ relied solely upon the lack of objective medical evidence to discount the limiting effects of Martin's alleged symptoms, "SSR 16-3p . . . explicitly precludes an ALJ from 'evaluat[ing] an individual's symptoms based solely on objective medical evidence,'" Freddette v. Berryhill, No. 17-cv-672-PB, 2019 WL 121249, at *8 n.5 (D.N.H. Jan. 7, 2019) (quoting SSR 16-3p, 2016 WL 1119029, at *4). Therefore, "it was [a] legal error for [the] ALJ to discredit [Martin's] statements solely for lacking corroborating objective evidence," Freddette, 2019 WL 121249, at *8 n.5 (citing Clavette v. Astrue, No. 10-cv-580-JL, 2012 WL 472757, at *9 (D.N.H. Feb. 7, 2012)); cf. Guziewicz v. Astrue, No. 10-cv-310-SM, 2011 WL 128957, at *6 (D.N.H. Jan. 14, 2011) ("If . . . the ALJ used the lack of objective medical evidence as his basis for finding [claimant] to be not entirely credible, rather than treating such a finding as compelling him to conduct a credibility assessment, that constitutes legal error on the ALJ's part."). The ALJ's legal

error, in turn, requires a remand. See, e.g., Gottier, 2016 WL 4734402, at *6; Weaver v. Astrue, No. 10-cv-340-SM, 2011 WL 2580766, at *8 (D.N.H. May 25, 2011), R. & R. approved by 2011 WL 2579776 (June 27, 2011); Guziewicz, 2011 WL 128957, at *6.

The Acting Commissioner's arguments to the contrary are not persuasive. In response to Martin's claim that the ALJ ignored his activities of daily living, the Acting Commissioner correctly states that: (1) an ALJ "is not required to address every Avery factor in [his] written decision for [his] evaluation to be supported by substantial evidence," Freddette, 2019 WL 121249, at *9 (citing Ault v. Astrue, No. 10-cv-553-JL, 2012 WL 72291, at *5 (D.N.H. Jan. 10, 2012)); and (2) an ALJ's decision is sufficient if it "contains specific reasons for the weight given to the individual's symptoms, [is] consistent with and supported by the evidence, and [is] clearly articulated so that any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms," id. (quoting SSR 16-3p, 2016 WL 1119029, at *9). But here, the ALJ did not rely on any of the Avery factors to explain why he was discounting the effects of claimant's symptoms; the specific reasons he gave were limited to the lack of objective medical evidence.

Moreover, the Acting Commissioner's attempt to show that the ALJ did consider Martin's daily activities actually

demonstrates that he did not. According to the Acting Commissioner:

> [T]he ALJ did reference [Martin's] testimony regarding his activities. (Tr. 28) ("The claimant testified to an extremely limited range of functional abilities. However, the objective medical evidence of record does not fully support those allegations."). Accordingly, [claimant's] assertion that the ALJ ignored his daily functioning is factually inaccurate.

Resp't's Mem. of Law (doc. no. 19-1) 14. To the contrary, the language from the ALJ's decision that the Acting Commissioner has quoted demonstrates that the ALJ used objective medical evidence, not evidence of Martin's daily activities, to discount his statements about the functional limitations that resulted from his symptoms. In sum, the only specific reason the ALJ gave for discounting Martin's statements about his symptoms was the lack of objective medical evidence and, as the court has explained, that was a legal error.

Finally, while the Acting Commissioner does not advance this argument, the court notes that in the section of his decision devoted to assessing claimant's symptoms, the ALJ stated that

> [w]ith regard to support for the above residual functional capacity, the undersigned incorporates herein by reference, as if fully set forth, the above discussion regarding the severe and non-severe impairments as evidence of the clinical findings and functional capabilities of the claimant during the period at issue.

Tr. 28. To the extent that the foregoing statement may reasonably be construed as an attempt by the ALJ to incorporate findings he had made earlier in his decision into his assessment of claimant's symptoms, that attempt does not satisfy his obligation to support his assessment of claimant's symptoms with evidence beyond the objective medical evidence. On this point, this case his much in common with Gottier, in which Judge McAuliffe explained:

> The ALJ did provide a detailed review of Gottier's activities of daily living in the context of his step-two determination, and again when summarizing her Function Report. However, missing from both discussions is any explanation as to why the ALJ found such activities might make Gottier's statements concerning her pain less credible. To the extent the ALJ did determine that these [activities of daily living] were inconsistent with Gottier's allegations regarding her symptoms, he ought to have so explained in his order.

2016 WL 4734402, at *6. So too, here. While the ALJ mentioned some of Martin's activities of daily living in earlier parts of his decision, that did not relieve him of the obligation, when assessing claimant's symptoms, "[t]o perform a proper discussion and analysis [by] identify[ing] what testimony is not [supported] and what evidence undermines the claimant's complaints," id. (quoting Anderson, 2014 WL 5605124, at *7).

To summarize, by limiting his assessment of claimant's symptoms to a consideration of the degree to which claimant's statements about his symptoms were supported by objective

medical evidence, the ALJ committed a legal error that requires remand.

2. Medical Opinions

Because this case must be remanded for a proper assessment of claimant's symptoms, there is no need for an in-depth analysis of Martin's claim that the ALJ erred in his evaluation of the medical-opinion evidence. However, for the benefit of the parties moving forward, the court offers the following observations.

Claimant does not couch his challenge to the ALJ's evaluation of the medical-opinion evidence in terms of the applicable regulations, i.e., 20 C.F.R. § 404.1527(c).[8] Nevertheless, he appears to be claiming that the ALJ erred by giving little weight to Dr. Huyck's opinions and by giving too much weight to Dr. Gaeta's opinions. According to Martin, Dr. Gaeta's "answers concerning [his] medical conditions were incomplete and difficult to follow," Cl.'s Mem. of Law (doc. no. 17-1) 5, and Dr. Huyck's "RFC assessment precludes [him] from performing any type of substantial gainful work activity on a regular and continuing basis," id. at 11.

---

[8] The rules in 20 C.F.R. § 404.1527 apply to claims, such as the one in this case, that were filed before March 27, 2017. For claims filed after that date, the rules for evaluating medical-opinion evidence are set out in 20 C.F.R. § 404.1520c.

18

As a preliminary matter, it is far from clear that Dr. Huyck ever gave an opinion on Martin's RFC. Rather, she merely met with Martin to review the results of Mr. Morneau's RFC assessment. Thus, the RFC assessment at issue was produced by Mr. Morneau, and Mr. Morneau is not an acceptable medical source.[9] However, even if Mr. Morneau were an acceptable medical source, and his RFC assessment were entitled to substantial weight as a medical opinion, it is far from clear that there is anything in that assessment that would count as substantial evidence to support a decision that Martin was disabled, notwithstanding Martin's belief that the limitations described in Mr. Morneau's assessment preclude employment. Specifically, the VE testified that the limitations on sitting and standing in Mr. Morneau's RFC assessment would not preclude Martin from performing the jobs he had previously identified, and while the VE did testify that a complete inability to reach, handle, or finger would preclude those jobs, Mr. Morneau's RFC assessment cannot reasonably be read as endorsing such restrictive limitations.

---

[9] The SSA has recently changed the regulation that defines the term "acceptable medical source." Compare 20 C.F.R. §§ 404.1502 & 404.1513(a) (2016 ed.) with 20 C.F.R. § 404.1502(a) (2017 ed.). But, as an occupational therapist, Mr. Morneau does not qualify as an acceptable medical source under either regulation.

19

In short, based on the record in its current form, claimant's challenge to the ALJ's evaluation of the medical-opinion evidence does not appear to be well founded.

### IV. Conclusion

For the reasons detailed above, the Acting Commissioner's motion for an order affirming her decision[10] is denied, and Martin's motion to reverse that decision[11] is granted to the extent that this matter is remanded to the Acting Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this order. The clerk of the court shall enter judgment in favor of Martin and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: May 6, 2019

cc: Judith E. Gola, Esq.
    Jessica Tucker, Esq.

---

[10] Document no. 19.

[11] Document no. 17.